Thank you, Your Honor. My name is Thomas Doyle. I'm from beautiful, sunny Portland, Oregon, and the firm of Bennett Hartman, representing Appellant here. I want to first thank you for the opportunity to present oral argument. I recognize that it's not a right, and I do appreciate your time in reviewing the matter. That's okay. You're definitely entitled, and most of us think you do have a right. We don't always honor it, but okay. Once again, I appreciate the opportunity. Thank you. We have an employment case, civil rights case, essentially. From our perspective, the primary issue is a FMLA, Family Medical Leave Act claim. This case is in the shadow of a prior case, Sanders v. City of Newport, that came out not too long ago, six months ago, and relates to an interference claim. Essentially, our position is there's triable issues of fact relating to the interference claim, plain and simple. There doesn't seem to be a whole lot of dispute about a lot of the issues, about a lot of the legal issues. From our perspective, it looks to me like the appellee has argued two points. One is that there is a – that these were not equivalent positions. And second of all, that they're entitled to a – entitled to sustain the summary judgment on their defense that they would have taken the same job action otherwise. We believe there's issues of fact at the very least on both of those, and we're prepared to argue on both of those. As far as the equivalent position, in our briefs we went through and looked at the two positions. The job he left, Mr. Wellington, as animal control director, basically a manager position. He left one job. He came back to another job. He came back to a position that no longer had most of the functions, that was in a different location, that really had none of the attributes of the prior job other than a very small, narrow focus relating to budgeting, when he – before he had direct supervision over employees, et cetera. We believe that those are simply not the equivalent position. Did his pay go down? His pay did not go down. Didn't lose any benefits. Did not lose benefits or pay. Just responsibilities. Extensive loss of responsibilities. He was in a different job, effectively. Same title, but when you are a location manager – and actually this comes into the subsequent termination. When you're a location manager, they're at the location supervising employees, although some managers might consider that to be a negative factor in terms of their job. It is a question of status and a question of prestige. It's a question of control, and it's a program that he created, that he managed, and suddenly he was taken out of it. He came back to a different job entirely, no longer had those managerial responsibilities, no longer had most of the programmatic responsibilities of animal control for Lane County. As a result, it simply was not an equivalent position. The salary, the title, those are not the – those are not determinative factors. Certainly, they come into play, but they are not determinative. The second question gets us to the legal issue, where we believe the district court made error. And from our perspective, it appears as though the appellee essentially concedes that. We are arguing based upon a notion that, look, we would have taken the same job action otherwise. That's why he's in a different position. And that is a – if it was – arguably, it was unclear prior to the Sanders v. City of Newport, but now it's abundantly clear that that's an issue on which the employer bears the burden to prove. Once, you know, under an interference claim, it's clear now that the essential attribute is that you are denied a benefit to which you're entitled under the FMLA. Here, there's no question, assuming it's not an equivalent position, that we satisfy that, that we satisfy all the elements. So then it goes to the defendant to be able to show that they would have taken the same job action otherwise. Here, almost every single basis that they argue for the same job action otherwise is contested. It's under pretext arguments that essentially that these – none of them add up. Budget concerns don't add up. The survey doesn't add up. The union concerns don't add up. There is evidence presented to the district court on each of those saying that makes no sense. Look, we have other facts that rebut those asserted reasons. Now, if that was something on which we held the burden, our position would be that we would survive summary judgment. But the notion that the defendant bears the burden and was able to sustain a summary judgment under those circumstances, we believe there cannot be a summary judgment granted under those circumstances. So as a result, we believe that that motion was wrongfully granted and that we're entitled to a jury to be able to determine what was the real reason here, what was the – whether they really did have other reasons unrelated to anything or they had good reasons. And I think that's an interesting question that you get to, but it's not really presented in this case. Yes, Your Honor. You have another claim, an ADA claim. Yeah. Where did the district court go wrong there? That's a good question. The district court on the ADA claim essentially took it, resolved a factual issue, that what was the reason, was it because of. We believe that there was evidence in the record that was presented saying, look, we had, and this is from Ms. Utecht, who's the director of HR, who has this meeting with Mr. Wellington at his home, dinner, and says maybe you should think about taking disability. Maybe you should talk to – your doctor doesn't think you're entitled to disability. Maybe you should go to another doctor and get another opinion. Let's stretch out this disability. Who is the person that made the decision to terminate him? As bureaucracies go, it's always hard to point the finger directly, but it appears to be Mr. Rockstraw is the – was the – had the programmatic responsibility of deciding the budget. That being said, the county. Did the HR person – what's his name? Utecht, is that his name? Utecht, yes. Did she ever suggest that he be terminated? From the evidence that we had, there was some disagreement internally, but that. She was his buddy, right? She was his buddy, but at the same time – and this is the don't do me any favors, my friend, when she's saying, hey, you should get out of here. The stress is causing – the stress of all of this stuff, plus your Hep C, or the chemotherapy related to that. It's all causing too much. You shouldn't come back. So in terms of being able to draw the lines from – okay, Ms. Utecht has this opinion. She certainly could have stopped the action. She's HR director. She was part and parcel of the process by which Mr. Rockstraw – and she was part – she was actually at the meetings where he was – when Mr. Wellington was brought back and was put into the other position. So there's no question. And here we have two operative, we'd say, wrongful acts. The return back to the position, which is not the same position, and then a month later, two months later, the working out through the budget process of that position. My claim is that they didn't put him in that other position because of his disability. That's absolutely right. It's twofold, that they didn't put him in that other position because of the disability, his original position, and look at the reason for the budget, the budget write-out of his position. They said, well, you know what? One of the essential things that we need – if we're going to pay good money for a position, we need someone that's actually there at the facility. You're not at the facility. So as a result, we're not going to have you. That wasn't because – was that because of his disability? I think that it's the disability, the concerns over his stress levels, his position, being able to handle that, that it affected it from the early – it affected the decision from the early standpoint, and that affected all the way through. And I think we have – we're able to draw that line, but that – Is there any connection between his actual illness and this concern for stress? I mean, is there a connection between hep C and being prone to stress? Well, I think that there's certainly a connection in terms of the chemotherapy that he was under. That's why he went out to begin with. He's still on that program after he returned. He was – you know, I'm not sure if the record reflects exactly. I think – I believe that he was, by and large, done with that program. Now, this is one of these things where the chemotherapy – people know about chemotherapy. They don't know why. And so we get into another interesting question of when the presumption that it's obviously serious, it could be cancer, it could be something else. You're going to want some time on rebuttals. So before we just keep running the clock on him, can I just ask you a specific question related to Judge Clifton's, is are you suggesting that he was disabled or was perceived to be disabled? And here this case arose in 2000. Yes or no, which? I believe that we are asserting that he was perceived as being a disabled individual. But he wasn't. I don't think at that time that he would have satisfied the – well, he had a record of impairment is what I should say there. All right. So under the ADA, the employer has an obligation to reasonably accommodate. You don't think that what they were doing, assuming that they were – he was disabled or perceived to be, that they were reasonably accommodating his disability and the stress? And I don't – I do not believe that the primary focus of our claim relates to a failure to accommodate. We look to the discrimination that they could – the accommodations, I think the only accommodation ever asked for was, hey, I need time off. I think the fact that they held the disability, perceived or record of disability that he had, the hep C or the chemotherapy relating to it, that that infected the decision to terminate. So it's a discrimination claim. So you're saying the budget thing then is just a pretext there, too? Absolutely. All right. Absolutely. I will reserve the remainder. Thank you very much. May it please the Court. My name is Jens Schmidt, and I'm here on behalf of the defendants. I wanted to first address the FEMLA and OFLA claims. But in light of the Court's questions about the ADA claim, I'd like to address some of the questions raised by the Court. Judge Paez asked who made the decision to terminate Mr. Walsh. I should maybe phrase it a little bit different. I was curious. Who set in motion the decision, the process of terminating him? It was Mr. Rockstraw. The evidence in the record is that Mr. Rockstraw, as the Director of Health and Human Services, was responsible for overall for preparing the budget for the Health and Human Services Department, of which Lane County Animal Services was a part. And he made the ultimately it was the Budget Committee of Lane County, or actually the Lane County Commissioners who adopted the budget that cut the position. Go ahead. But Mr. Rockstraw set those wheels in motion. Now, Mr. Rockstraw knew that he had been out on medical leave. He did. And he knew that he had been receiving chemotherapy treatment. He did. And it's your position that that was not a factor in their decision? That's correct. To put him in this other position? Well, let's distinguish between that. Don't they at least raise a factual dispute over that? No, they don't. Why not? Because, first of all, the way the claim was pled, it's important to distinguish between the decision to change his job duties when he returned from medical leave in March of 2008 and the adoption of the budget two months later where his position was eliminated. What was pled in the second amended complaint on the ADA claim was not that the county discriminated against him for having a record of disability. Keep your voice out of that. Yes, I'm sorry. The claim in the second amended complaint is not that the adverse employment action on the ADA claim was the elimination of his position. The claim is that the adverse employment action was not reinstating him to his position when he came back from medical leave. So the way it was presented to the lower court, and with respect, I think the issue before the court on de novo review, is whether on the ADA claim there is a triable issue of fact on whether the decision to change his job duties when he came back from medical leave was in retaliation or they took into account. Yes. And the only evidence that was submitted that was argued to the lower court and is argued on appeal is that in Ms. Utek's testimony, she said one of the reasons that he wasn't put back at the animal shelter when he came back from work was that there would be a concern that there would be picketing and protests at the animal shelter. And in her testimony, she said something like, we were concerned for his well-being and the stress it might cause to him going back out to the animal shelter. The evidence is undisputed. If you draw all the inferences in the most light favorable to him, why doesn't that suggest that when she says we were concerned about his well-being, that his or their knowledge of his medical leave and the reasons for his medical leave was not a factor in that decision? I would say for two reasons. It's sufficient to raise a factual dispute. I would say for two reasons. First of all, it's a stretch to say that a statement that they were concerned about the stress he might feel and his well-being is connected to some knowledge that he has a record of having hepatitis C. In fact, the evidence in the record is that Ms. Utek, Commissioner Fleener, and Mr. Rockstraw did not even know that Mr. Wellington had hepatitis C until after his employment ended. The only ---- Well, they knew he had been out for a somewhat substantial period of time. Yes. And he was out on a medical leave. Yes. Isn't that enough to suggest that his job placement upon his return was at least to some degree influenced by their understanding of his condition? No. I don't think it is, because I think it's too much of a leap to go from we were concerned that there would be protesting out there and how it would affect his well-being with saying that they were discriminating against him because he had had hepatitis C. Well, I think they were discriminating against him, but if they make a judgment, gee, the job that he really occupied before when he was at the animal shelter, that's going to be too hard for someone his condition. So we're going to accommodate by creating this different job, which unfortunately is on the budget block two months from now and disappears. It's not so hard to compress those to say, okay, there's this person that we think is disabled and can't work. We'll accommodate by giving him this title for six weeks, but he's history after that because we don't think he can do the job. Now, the latter case would seem to be a viable ADA claim. Why is this case different from that? Well, because I think when you read Ms. Utech's testimony, that's not a fair inference. There's no evidence that she was aware of his disability or even that the statement that she made that we're worried about stress would be was based on the fact that he had been off on leave and that he was sick for some reason. There's no evidence that she thought that she knew anything about his condition or whether he was still suffering from whatever. Isn't she the one that had dinner with him while he was out? Yes. And didn't she learn quite a bit about his medical condition? No. No, she didn't. There's no evidence that she knew what his medical condition was until after. Did she know that he was getting chemotherapy? Is that what you're saying? I don't know of any evidence in the record that yes. She's an HR person? Yes. No, she didn't. And I believe in her testimony, in their deposition, they don't. Lane County has a third-party administrator handle medical leave. Right. So she didn't know why he was on medical leave. Of course she knew he was on medical leave. Right. They all knew he was on medical leave. Yes. Yes. Some of them seemed to have known that he was receiving chemotherapy. Mr. Rockstraw did. Yes. And I believe Ms. Gaffney did, although she's not a defendant in the case. But I believe they are the only two that knew he was receiving chemotherapy. But my point, I guess, is that if there were some ---- What about that dinner that Utech suggested to him that he could consider, you know, taking long-term disability? Well, again, I don't know how that ties to her ---- You know, you draw inferences. You can draw inferences from somebody. And he's entitled to, at this stage ---- He is. He's entitled to all reasonable inferences. I don't dispute that. He's a nonmoving party. Yes. I don't dispute that. But I would say that ---- What was her thought that, as an HR person, that his disability would be, then? I'm sorry? If she suggested long-term disability, you have to have a disability. So what did she think it was? There's no evidence in the record of that. But she thought he had a disability. Yes. And you don't just get that because you get stressed out going to your job, do you? Well, but, again, that's a month or two before. Now he's coming back to work. And, again, if there was some evidence in the record that she was concerned that he was still suffering from whatever disability he had been suffering from when he came back to work, and so there was some connection between her statement that I was concerned for his well-being because he was going to be the target of protests, I don't think that is a fair inference to draw that she connected any stress he might feel from being the target of protests. I think we have that. You better turn to the FMLA. Okay. Just briefly on the FEMLA and OFLA claims, again, it's important to distinguish the interference claim from the retaliation claim and the not putting him in or changing his job duties when he returned to work to the ultimate decision to terminate his employment. The issue on appeal is whether the district court erred in granting summary judgment by not reinstating him to his former position and later terminating his employment after he returned from medical leave. And on the OFLA and FEMLA claims, the plaintiff did allege a retaliation claim on the OFLA claim, but not on the FEMLA claim. Let's focus on the interference claim. Okay. You agree that under our case law, a motivation or a causal connection was not required. I agree. And as I read the district court's order, it's pretty clear that what the district court found lacking was that causal connection with regard to the interference claim as well. I agree. Isn't that a problem? It would be if you had to give some deference to the district court and follow Judge Aiken's analysis, but you don't. You review summary judgment de novo. So what basis do we have for saying summary judgment should be upheld? On the interference claim, the basis is this. With respect to the reinstatement, when he got back to work, he went back to work to the same job position. The same title, but it wasn't really the same job, was it? It wasn't located at the same place? It wasn't. He was directly supervising the animal shelter. It wasn't. But what did remain the same was the job title, the pay to whom he reported. What changed was where he worked and who he supervised. And the reason that it was to the same position is that all of the job duties that he had when he returned to work were all job duties within his job description. I think it's a different case if you had put him in a different position where he is asked to do things that were not. Did he have the same responsibilities? No. No. His job duties changed. He no longer had responsibility. Did he have the same authority? Not in the sense of supervising the staff at the animal shelter, no. He didn't. Are you familiar with how the CFR defines, you know, return to an equivalent job? I do. I am. It must involve the same or substantially similar duties and responsibilities which must entail substantially equivalent skill, effort, responsibility and authority. Now, you just said he didn't have. He didn't have some of them. I don't know why he doesn't at least raise a tribal issue of fact. Well, because all of the things he did do when he returned to work were within the scope of his job duties. And secondly, it's important to remember the context of this, and this is where the budgeting process comes in. When he returned to work, at that point the county, the evidence is that the county thought that it wasn't going to get some substantial amount of money from the federal government. Timber money is what it's referred to in the record. And in Ms. Gaffney's testimony, when she explained the basis for this reassignment of his job duties, she says it was really a holding pattern because we didn't even know whether this position was going to survive, and ultimately it didn't. So I think a position did survive that involved direct supervision and presence at the animal shelter. A supervisor's position survived. Well, that's a lot closer to the job that he had before than the job he had after. From his perspective, at least with the benefit of hindsight, he would not view giving him this new position to be any favor because it was that new position that was on the chopping block in the event that the budget cuts required cuts, which the county later apparently concluded that they did. Now, there's a whole set of arguments that, in fact, the budget wasn't decreased. But accepting the county's position here, doesn't that by itself suggest at least a colorable argument that the reassignment or the assignment to this reconfigured position was not any favor for him and was in fact an impairment of his position because it made that position, that position was the one that was most vulnerable to a budget cut. I would agree that they curtailed his job responsibilities, but it wasn't a reassignment to a new position. He returned as manager and his job duties within the manager position changed. I've got 30 seconds, so let me just say one thing. On the issue of whether the county would have changed his job duties when he returned to work and would have terminated his position by the budget adoption, I agree that under Sanders the county has the burden of proof on that issue. But on summary judgment, if you look at our answer, we did in fact allege broad affirmative defenses, not specific to FEMLA, but that the county's actions were lawful, nondiscriminatory, and taken for legitimate reasons. And the record demonstrates that they would have done these things anyway, even if he hadn't taken the FEMLA OFLA leave. One final question. You mentioned that an on-site physician did survive. Was it known at the time that Mr. Wellington was shifted out of the location and those responsibilities that there would have to be at least a supervisor level position at the facility? No. No. So if he had, Judge Clifton suggested that they didn't do him any favor by putting him in this other position, which was then on the chopping block, if the alternative had been to keep him on site, what you're saying is that that would have entailed a reduction in job responsibility or at least pay and benefits? No. And let me clarify my earlier answer. Certainly the record would support the inference that the county knew that somebody needed to supervise the staff at the animal shelter. So they knew that, certainly. But the evidence shows that between the time Mr. Wellington returned to work in March and the adoption of the budget in late May of 2008, the discussion was how do we cut the budget out there, and the main thing they debated was do we cut the supervisor position, which was Mr. Howard, who's a defendant in this case, or do we cut the manager position? Okay. But the supervisor and manager got the same level of pay? No. So if they decided to put Mr. Wellington into the supervisor category, so he wouldn't be least likely to be put on the chopping block, he would have had to take a pay reduction? Yes.  Thank you. Very quickly on that issue in terms of this, you can kind of get a sense that there's a moving target for us in terms of the reasons for putting Mr. Wellington into a different position when he came back. There is this insinuation that it was budget concerns, that basically the person goes on leave and they're looking at budgets for the next year, and they say, well, since we're looking at budgets for the next year and you came back from leave, we don't know what to do with you right now because we may have to do something about your position in the future. So the idea that this budget basis was a basis for not reinstating him to the position that he held before. Okay. I understood that they had other reasons, which were the concern about his management, the survey, and others, and that the termination later on was unrelated to the move. It's just that's why he was terminated, because of budget concerns, which then those turned out to be apparently not as severe. But in any event, I don't want to get us too confused here. And absolutely. I guess my only point there is that if there is a factual issue as to what was their motivation, what was their reason back in relating to budget issues or anything like that, and obviously motivation doesn't come in under the refusal to be in State, but the subsequent actions relating to the ADA issues and all of these different reasons that we're entitled to a jury to be able to sort those out. Do you still have a, and you just clarified this for me real quick, a retaliation claim under OFLA? It's a good question. I think we still do. I think that the question there is whether there is, in terms of the evidence of intent based, you know, in going to the retaliation type of analysis, and I think once again, relating to the differing alternative reasons, this moving target, we think we can. But under OFLA, you had both an interference and a retaliation claim. But under FMLA, you only had an interference. An interference. And I think, obviously, we're focused on the interference claim, Your Honor. Okay. Suppose the real reason that he was terminated is, was a policy difference. That is, the public sentiment had swung in favor of this no-kill or anti-euthanasia policy of the animal shelter, a movement that has been felt in many communities. Was his job protected by civil service or anything else under Oregon law, or was he susceptible to being discharged simply because the county officials decided that he was no longer in step with the policy they wanted to pursue? If that was the reason, once again, I'll go back to, that's the – they get to try to prove that if we get to a jury. And they're able to prove that. Is that a reason they can validly claim? But I think that they can. But the reason – if they say, look, the real reason we did this was because of policy differences, then that – if they had done that at the time, there's good reason why they wouldn't want to do that, because of the civil service process, because of the due process issues relating to saying, look, we have a different policy direction for this manager. So there are good reasons why they would want to avoid that civil service process and use the method and methods that they did here. That's the best answer I can give. Thank you. Unless there are any further questions, thank you very much for your time. Thank you. Thank you, counsel, on both sides. We appreciate the argument. All right. The Wellington case is submitted.
judges: Fisher, Paez, Clifton